UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ELIZABETH C. HALL,

                Plaintiff,

-vs-                                      Case No.  6:10-cv-150-Orl-28DAB

AT&T MOBILITY SERVICES, LLC,

                Defendant.

_____

# ORDER

Plaintiff, Elizabeth Hall ("Hall"), brings the instant action against her former employer, AT&T Mobility Services, LLC ("AT&T"), alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("the FMLA"). The case is before the Court on the Motion for Summary Judgment (Doc. 24) filed by AT&T, Hall's Response (Doc. 25), and AT&T's Reply (Doc. 31).  As discussed below, AT&T's motion must be granted as to all three of Hall's claims.

## I.  Background

AT&T is a provider of mobile communication services and products to individual, business, and government users.  (Friedman Decl., Ex. 1 to Doc. 24, ¶ 2).  Hall has worked for AT&T on three occasions; she was initially hired by an AT&T predecessor entity in 1994 and commenced her most recent term of employment in January 2004.  Only the last period of employment is at issue in this case.

As Hall explained in her deposition, when she was rehired in January 2004 she worked in the position of Enterprise Corporate Account Manager ("ECAM") at AT&T's Maitland, Florida office.  (Hall Dep., Attach. to Doc. 24, at 48).  In June 2005, Hall was moved to the position of Corporate Account Executive II ("CAE II") at AT&T's Lake Mary, Florida office, and in January 2006 she was promoted to Corporate Account Executive III ("CAE III") in AT&T's Corporate Markets Group.  (Id. at 53-56; Friedman Decl. ¶ 9).  As a CAE III, Hall was initially supervised by Todd Howard, who in turn was supervised by Joe Friedman, the Area Vice President for the Corporate Markets Group in Atlanta.

Like other CAEs, Hall was assigned a monthly sales quota of new mobile device activations and was required to adhere to the Corporate Markets Group Activity Standards Sales Behavior and AT&T's Code of Conduct ("Code of Conduct").  CAEs were subject to being placed on discipline if they did not "maintain acceptable performance with respect to quota attainment" as indicated by a document known as "the VDI Report" that measured mobile device activations and disconnections. (See Friedman Decl. ¶¶ 6-7).  Specifically, under AT&T's Progress Performance Management Discipline Policy ("Discipline Policy"), CAEs could be placed on performance discipline if they did not achieve 80% or greater of their sales quota in a rolling ninety-day period or did not achieve at least 50% of their quota within a single month.[1]  (Id. ¶¶ 4, 7; see also email from Friedman to Hall, Oct. 22, 2007,

---

[1]The monthly quota for CAE IIs was 92 activations, and the monthly quota for CAE IIIs was 116 activations.  These quotas were based on job title and were uniform within AT&T nationwide.  (See Friedman Dep. at 72-73).  Although the numerical quotas were different for CAE IIs and CAE IIIs, the percentage attainment requirements were the same; in other words, all CAEs could be placed on discipline for failure to achieve 50% of their respective monthly quota or 80% of their respective ninety-day rolling average quota.

Attach. to Friedman Dep. [hereinafter "Friedman email"] (summarizing the Discipline Policy);

Hall Dep. at 107-08 (acknowledging policy requiring 50% of quota each month)).   The

Discipline Policy had four levels: Level 1–Counseling Notice; Level 2–Written Warning; Level

3–Final Written Warning; and Level 4–Termination.  (Friedman Decl. ¶ 7; see also Friedman

email).

  If an employee was placed on a level of discipline, that level of discipline status would

remain in place until performance improved for several consecutive months; a Counseling

Notice would remain "active" for three months, a Written Warning for four months, and a

Final Written Warning for six months.  (See Friedman Dep., Doc. 29-1, at 14-20; Friedman

Decl. ¶ 7; Friedman email).  If performance did not improve, however, an employee was

subject to being "progressed" to the next step of discipline at any time after issuance of the

previous step.  (Friedman Decl. ¶ 7; Friedman email).  Progression could occur when sales

numbers were finalized for the month—which happened early in the following month—and

management had discretion as to whether and when to impose discipline or to progress

employees to the next step.  (See Ufret Dep., Attach. to Doc. 27, at 11; see also Friedman

Decl. ¶ 7; Hall Dep. at 108-110).

  On July 24, 2007, Hall's supervisor, Todd Howard, issued her a Counseling

Notice—the first level under the Discipline Policy—based on Hall's June 2007 sales

performance.  (Counseling Notice, Def.'s Ex. 4 to Hall Dep.).  As stated in that Counseling

Notice, Hall achieved only 28% of her sales quota in June 2007—less than the required

50%.  Hall disputed the Counseling Notice by "refusing to accept it" from Howard, but she

acknowledged in her deposition that she in fact did not achieve 50% of her quota in June

2007.  (Hall Dep. at 98-99, 103-04).

On August 1, 2007, Howard moved to a different position within the company, and from then until late October, Hall had no immediate supervisor; in the interim, Friedman served as her acting supervisor.  On October 22, 2007, Friedman issued Hall a Written Warning—the second step of the Discipline Policy—because her ninety-day rolling average was 71%—less than the required 80%.  (Written Warning, Def.'s Ex. 3 to Hall Dep.).  On October 24, 2007, Ricky Ufret became the Corporate Sales Manager in the Corporate Markets Group, and as such he also became Hall's new immediate supervisor.  At that point, there were only two CAE IIIs working under Ufret—Hall and Christopher Castro—and four CAE IIs—Jason Lail, Vincent Niglio, Judy Anderson, and Jennifer Martin.  (Hall Dep. at 121; Ufret Dep. at 8).

On November 15, 2007, Hall sent an email to AT&T's HR representative, Virginia Forbes ("Forbes"), complaining of gender discrimination.  (Email from Hall to Forbes, Pl.'s Ex. 1 to Forbes Dep.).  In that complaint, Hall asserted that her sales performance for 2007 had been higher than that of two male CAEs, Lail and Niglio, "[y]et to [her] knowledge[] neither [of them had] been given a formal performance reprimand." (Id.).  Forbes conducted an internal investigation regarding the complaint but closed it after concluding that employee discipline appeared to be progressing as it should.  (Forbes Dep. at 23).

Hall's ninety-day rolling average was below 80% in November 2007, (Hall Dep. at 157), and in mid-December Hall was issued a Final Written Warning by Ufret.  (Final Written Warning, Def.'s Ex. 2 to Hall Dep.).  The Final Written Warning is dated December 19, 2007; however, Hall testified in her deposition that the Final Written Warning was faxed to her on

December 16, (Hall Dep. at 155-56), and that she had been told on November 1 that she was going to be issued a Final Written Warning, (id. at 145).  As had the prior discipline notices, the Final Written Warning informed Hall that her sales performance was "not acceptable and must be corrected immediately."

On December 24, 2007—a week after receiving the Final Written Warning—Hall requested ninety days of FMLA leave.  That request was granted by AT&T, and Hall was out on FMLA leave from December 24, 2007 until March 24, 2008.  Upon Hall's return to work on March 24, 2008, she was informed by Ufret that her employment was terminated based on her November and December sales performance.  (Hall Aff., Doc. 26-1, at 2).  Hall submitted a charge of discrimination to the EEOC on April 9, 2008, and she filed this lawsuit in January 2010.

II. Discussion

A.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance

of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'  Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").  "[T]he summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

### B. The Merits of AT&T's Motion

In her complaint, Hall brings a claim of gender discrimination under Title VII and claims of retaliation under both Title VII and the FMLA.  These claims are addressed in turn.

### 1.  Gender Discrimination (Count I)

First, Hall contends that AT&T discriminated against her on the basis of her gender.  Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  "On any Title VII claim the plaintiff bears 'the ultimate burden of proving discriminatory treatment by a preponderance of the evidence.'"  Crawford v. Carroll, 529 F.3d 961, 975 (11th Cir. 2008) (quoting Earley v. Champion Int'l Corp., 907

F.2d 1077, 1081 (11th Cir. 1990)).  Because Hall has not presented any direct evidence of discrimination, the Court evaluates her claim using the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny to determine if Hall can establish her claim through circumstantial evidence.

Under this three-part framework, the plaintiff has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802.  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  If the plaintiff establishes a prima facie case, a presumption of discrimination arises.  See, e.g., Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

If the plaintiff presents a prima facie case, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  "If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  Chapman, 229 F.3d at 1024 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff may make a prima facie showing of discrimination by showing: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was . . . treated less favorably than a similarly-situated individual outside [her] protected class." Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). It is undisputed that Hall is a member of a protected class, that she was qualified for her position, and that she suffered an adverse employment action when she was terminated.[2] However, AT&T challenges whether Hall was treated less favorably than any similarly situated male employee.

Hall asserts that she was treated less favorably[3] than two male CAE IIs, Jason Lail and Vincent Niglio—the two men who were the subject of Hall's November 15, 2007 gender discrimination complaint to AT&T's HR department. In that complaint, Hall stated that to her knowledge, neither Lail nor Niglio had been issued discipline even though Hall's sales performance was better than theirs. As Hall has now been made aware during the course of this litigation, however, these two male CAEs were in fact issued discipline around the same time that she was, and both also were terminated. Nevertheless, Hall maintains that

---

[2]In the Amended Complaint (Doc. 6), Plaintiff describes several actions by AT&T that allegedly were discriminatory, including assignment of accounts and implementation of the discipline policy that ultimately led to her termination. Plaintiff does not address account assignment in her summary judgment response, and the Court construes Count I as limited to Plaintiff's termination, with the disciplinary policy implementation considered part and parcel of the termination.

[3]Hall argues dissimilar treatment as pretext evidence and has not responded to AT&T's contention that Hall failed to present a prima facie case. Because the issue of pretext does not arise until the third phase of the McDonnell Douglas analysis, the Court considers the issue of dissimilar treatment in the prima facie case discussion. To the extent it also pertains to pretext, the outcome is the same.

the Discipline Policy was not applied in the same manner to her as to the male CAEs. Examination of the record evidence on this point refutes Hall's contention.

Lail was hired by AT&T in September 2005 as a CAE II, and on May 16, 2007—two months before Hall was issued a Counseling Notice—Howard issued Lail a Counseling Notice based on Lail's 73% ninety-day rolling average for February through April and other performance shortcomings.   (See Counseling Notice, Ex. B to Friedman Decl.).   As explained by Friedman, Lail improved his sales figures for three consecutive months and accordingly, the May 2007 Counseling Notice expired without Lail being "progressed" to the next level of discipline.   (Friedman Decl. ¶ 17).   However, Lail was issued a "new" Counseling Notice on December 5, 2007 by Ufret because Lail achieved less than 50% of his quota in October and his ninety-day rolling average was only 45% rather than the required 80%.   (Counseling Notice, Ex. E to Ufret Decl., Doc. 24-2).   Lail was terminated the very next day—December 6, 2007—for recording the telephone conversations of others. (Ufret Decl. ¶ 12).

Niglio was hired by AT&T in December 2006 as a CAE II, and he was issued a Counseling Notice by Howard on June 18, 2007—one month before Hall received hers—based on his 19% ninety-day rolling average.   (Friedman Decl. ¶ 18; Counseling Notice, Ex. C to Friedman Decl.).   The very next month, he was progressed to a Written Warning because his ninety-day rolling average was only 33%.   (Written Warning, Ex. D to Friedman Decl.).   Ufret issued Niglio a Final Written Warning on December 27, 2007 because his ninety-day rolling average was only 71%.   (Final Written Warning, Ex. F to Ufret Decl.).   In early 2008, Niglio was transferred from the Corporate Markets Group to the Small

Business Markets division.  On July 1, 2008, Niglio was terminated because his ninety-day rolling average was 79% rather than the required 80% and because of other shortcomings. (Friedman Decl. ¶ 19).

The record evidence does not reflect that Hall was treated differently from Lail or Niglio.  Hall has not presented any basis for challenging Lail's performance improvement and removal from his first "Counseling Notice" status, and he was placed back on discipline when his sales numbers fell again in late 2007.  Furthermore, Hall and Niglio were progressed from Counseling Notice to Final Written Warning over approximately the same six- or seven-month time period, and the Court cannot conclude that such treatment is materially different.[4]

Hall also contends that the Discipline Notices issued to Lail and Niglio were more favorable and evidence heightened scrutiny of Hall because they referenced a six-month monitoring period, whereas the Notices sent to Hall referred to a twelve-month period. However, these different time periods have not been shown to be relevant to this case and do not establish different treatment.  Both Ufret and Friedman testified that these Notices were largely software-generated, and any length of monitoring time stated in these Notices is not germane to the facts at issue.  If Hall had improved her performance for longer than the times stated in the Discipline Policy yet continued to be "monitored" or kept on discipline status, such different time frames could perhaps be evidence of dissimilarity, but this is not

---

[4]Hall argues that Niglio's performance was "worse" than hers, but she does not dispute that her performance was below the required percentages of her quota when she was progressed.

what occurred in this case.  Instead, the evidence reflects that all three employees were kept on status for the time periods stated in the Policy and not the "monitoring" periods that were stated in their Notices.

Hall further asserts—citing the December 19, 2007 date on her Final Written Warning—that she was given only twelve days during the Christmas holiday period to cure her performance deficiencies, while Niglio "was provided six months to cure." This argument is not well-taken.  First, even though Hall's Final Written Warning was dated December 19, 2007, Hall knew well before that date that her results for December—not just the twelve days of December after the date of the Final Written Warning—would be crucial.  She testified in her deposition that she knew in early November that she was going to be progressed to a Final Written Warning, and all of the discipline notices informed the CAEs involved that immediate improvement was required, that if they did not improve they could receive additional discipline, and that they remained at-will employees who could be terminated at any time.  Second, there is no evidence that Niglio "was provided six months to cure."  As explained earlier, the monitoring periods noted in some of the Notices did not equate to the time an employee had to remedy deficiencies.  And, although it is true that Niglio was not terminated until six months after his Final Written Warning was issued, there is no evidence in the record as to what Niglio's sales numbers were after he was issued the Final Written Warning.[5]  Moreover, Ufret was no longer Niglio's supervisor once Niglio was transferred,

─────────────────────

[5]In this vein, neither party has provided the Court with an authenticated "set" of sales numbers for the employees discussed herein—even for 2007.  Hall has submitted a chart of sales numbers (Ex. A to Hall Aff.), which she states "was obtained from an internal website of AT&T," (Hall Aff. ¶ 2), but that chart is inconsistent with the chart Hall included in

(see Ufret Dep. at 33-34); thus, even if Niglio was an appropriate comparator for Hall during 2007,[6] he no longer was once he moved to a different division under a different supervisor in 2008.  Hall's assertion of "different cure times" is rejected.

Hall next asserts that Niglio's move from the Corporate Markets Group to the Small Business Markets division in early 2008 was an improper "transfer" or "promotion" that Niglio should not have been given because Niglio was on a Final Written Warning status, and she notes that she was not "allowed" a transfer in lieu of termination.  However, Hall has not rebutted AT&T's evidence that Niglio's move was not a promotion or even a typical transfer; instead, it was part of a corporate reorganization necessitated by the combining of AT&T and Cingular in late 2007.  Both Friedman and Ufret explained that as part of that reorganization, there was a companywide directive regarding movement of some employees to the Small Business Markets division, and the determination was made based on the type of accounts in an employee's module.  Niglio had a high percentage of accounts that were going to the Small Business Markets division, and for that reason Niglio was moved to that division.

———————————————

her email complaining of gender discrimination (Pl.'s Ex. 1 to Forbes Dep.), and the Court is not otherwise satisfied as to its reliability.  In any event, use of the numbers in Hall's charts would not affect the rulings in this Order.

    [6]The Court has assumed for the sake of argument that Lail and Niglio—CAE IIs—were "similarly situated" to Hall—a CAE III—and has largely focused on the issue of "favorable treatment."  However, in light of Hall's own deposition testimony regarding the difference between her experience in the CAE II position versus the CAE III position, this assumption is somewhat questionable.  (See Hall Dep. at 48-58).  Moreover, Niglio's newness to the company as compared to Hall's more than ten years of experience certainly brings his "similarity" into question; in fact, Ufret and Friedman have explained that any discrepancies in the treatment of Niglio as compared to Hall were due to Niglio's newness to the company.  (See Friedman Decl. ¶ 20; Ufret Decl. ¶ 15).

(Friedman Dep. at 55-57).  The decision was made at a higher level than Ufret, and Ufret had no power over that decision.  (Ufret Dep. at 32).  In sum, the Court cannot conclude that Niglio was "treated more favorably" than Hall in any material way.

Hall also attempts to compare herself to the lone other CAE III, Christopher Castro. Castro was not placed on discipline during 2007, and Hall does not allege that he was not meeting his required numbers during that year.  However, in mid-2008, after Hall had been terminated, Castro was "surplussed" based on poor performance rather than terminated, and Hall contends that this amounts to more favorable treatment because Castro could be rehired whereas she, as a "terminated" employee, could not.  This argument is not well-taken.

Castro's separation from employment occurred as part of a reorganization and a companywide directive in which the lowest performers had to be "surplussed." (Id. at 25-28). The "surplussing" of Castro months after Hall's termination is not comparable to her termination, which was not part of a companywide reorganization.  Moreover, there is no evidence as to Castro's level of performance—only that he was among the lowest of his group at the time that a companywide surplus was implemented.  Hall has not shown that Castro was similarly situated or treated more favorably than she, and thus she does not satisfy her prima facie case by relying on him.

In sum, Plaintiff has failed to present evidence that a similarly situated male was treated more favorably.  Thus, Plaintiff has not satisfied her prima facie case, and Count I fails for this reason alone.

Even assuming arguendo that Plaintiff had presented a prima facie case, AT&T has

met its burden of production by articulating two legitimate, nondiscriminatory reasons for terminating Hall.   First, AT&T asserts that Hall was terminated based on her sales performance—as she was told by Ufret at the time of her termination.  Second, although not explained to Hall at the time she was terminated, AT&T also states that Hall was terminated based on Code of Conduct violations that were discovered while Hall was out on FMLA leave.

Because AT&T has advanced legitimate reasons for Hall's termination, the burden shifts to Hall to come forward with evidence that these articulated reasons are a mere pretext for discrimination, for "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Chapman, 229 F.3d at 1024-25.  "To show that the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs, 106 F.3d at 1538), overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006).

Hall attempts to cast doubt on the performance-based reason by challenging the manner in which AT&T applied its Discipline Policy.  As discussed earlier, Hall concedes that her sales performance fell below the required levels at the time she was progressed through the Discipline Policy, but she argues that the discipline issued to her was inconsistent with the discipline issued to male CAEs and that this difference is evidence of pretext.

The comparative evidence that Hall presents has previously been discussed with regard to the fourth prong of Hall's prima facie case, and for the same reasons that it did not suffice to establish a prima facie case it also fails to raise an issue as to pretext.  AT&T handled similar situations in similar, if not identical, ways under the Discipline Policy.  As noted earlier, in light of the similar application of the Discipline Policy and the lack of a difference in the ultimate fate of the employees at issue, any slight differences do not give rise to a genuine dispute of material fact as to whether Hall was disciplined and ultimately terminated based on her gender rather than based on her sales performance.

Hall has also failed to raise a genuine issue as to pretext with regard to AT&T's second articulated reason for Hall's termination—Code of Conduct violations.  It is undisputed that AT&T was informed of several improprieties in Hall's accounts by another female CAE, Judy Anderson, who was assigned to handle Hall's accounts while Hall was on FMLA leave.  (Ufret Decl. ¶ 6).  Those violations involved pricing and billing of accounts.

Hall now attempts to explain the alleged violations, but she has not presented any evidence that AT&T did not reasonably believe that the violations had actually been committed at the time of Hall's termination.  For example, one of the issues involved an account with a law firm.  Anderson discovered that family members of the law firm's employees were included on the account even though they should not have been, and Hall had thus been receiving "production credit" based on those family members.  Hall argues that any problem with that account originated years earlier when the account was assigned

to a male CAE.[7]  However, AT&T has explained that regardless of the origin of the problem Hall was held responsible for the issue because it was her assigned account.  (Id.).

"[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."  Combs, 106 F.3d at 1543.  Although it may seem harsh to Hall—who argues that AT&T should have investigated the origin of the account problem—it is AT&T's prerogative to hold Hall accountable for improprieties in her assigned accounts.  The Eleventh Circuit has emphasized that "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'"  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)).

In sum, Hall has not presented evidence creating a genuine issue of material fact as to whether AT&T's stated reasons for terminating her are merely a pretext for gender discrimination.  AT&T's Motion for Summary Judgment on Count I must be granted.

2. Retaliation Under Title VII (Count II)

---

[7]Hall seems to acknowledge that AT&T actually believed that Hall created the problem with the law firm account.  (See Pl.'s Resp., Doc. 25, at 9 (suggesting that AT&T only realized during discovery in this litigation that a prior CAE—not Hall—initiated the improprieties in that account)).

In Count II, Hall contends that she was terminated in retaliation for the complaint of gender discrimination that she made to AT&T's HR department in November 2007. The anti-retaliation provision of Title VII provides in part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).   Hall attempts to establish her retaliation claim through circumstantial evidence, and the McDonnell Douglas burden-shifting framework discussed earlier applies to her retaliation claim as well.

To make a prima facie showing of retaliation under Title VII, a plaintiff must establish: (1) that she engaged in activity protected by Title VII; (2) that she was subjected to a materially adverse action by her employer; and (3) a causal connection between the protected activity and the adverse action. Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 978 n.52 (11th Cir. 2008). It is not disputed that Hall engaged in protected activity or that she was terminated, but AT&T contends that Hall has not established a prima facie case of retaliation because there is no causal connection between Hall's charge of discrimination filed on November 15, 2007 and her termination on March 24, 2008.

To satisfy a causal connection, Hall must show "that the protected activity and the adverse action were not wholly unrelated." Simmons v. Camden Cnty. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). Generally, close temporal proximity is enough to satisfy a causal connection. Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir.

2000).  AT&T asserts that because four months passed between Hall's complaint and her termination, the temporal proximity is not close enough.  Although the Eleventh Circuit has held that periods of three or four months are too protracted to constitute close temporal proximity, see Thomas v. Cooper Lighting Inc., 506 F.3d 1361, 1364 (11th Cir. 2007), in light of the fact that three of the four months in this case consisted of Hall's FMLA leave, the lapse of time was essentially only one month and will be regarded as such in the causation analysis.

A one-month time lag, standing alone, can be enough to satisfy the causal connection element of a prima facie case.  However, intervening events can negate the inference of causation that may arise from temporal proximity.  See Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520 (11th Cir. 2007) (noting that "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity").

Here, it is undisputed that AT&T initiated the disciplinary process with a Counseling Notice to Hall on July 24, 2007—four months before Hall's protected activity—and that her poor performance was noted again with a written warning on October 22, 2007–nearly one month before her protected activity.  Thus, two of the four steps of AT&T's Disciplinary Process were completed before Hall ever engaged in protected activity.  Moreover, Hall testified in her deposition that she had been told in early November that she was going to be progressed to a Final Written.  (Hall Dep. at 145).  Hence, Hall had in essence been advised of three of the steps and that termination was an imminent danger even before she complained.

Courts have cautioned against finding causation when a plaintiff receives multiple "warnings about [her] performance before [her] alleged protected activity," as this severs the causal connection necessary for a prima facie case. See, e.g., Spence v. Panasonic Copier Co., 46 F. Supp. 2d 1340, 1348-49 (N.D. Ga.) (collecting cases from the Third, Seventh, Eighth, and Eleventh Circuits), aff'd, 204 F.3d 1122 (11th Cir. 1999).  Based on the undisputed facts that Hall received multiple warnings about her poor sales performance before engaging in protected activity and that she continued to perform below required sales levels after engaging in protected activity, an inference of causation does not arise simply from the temporal proximity between Hall's complaint of discrimination and her termination; nor is there any other evidence of a causal link.  Thus, Hall has failed to establish a prima facie case of retaliation.

Even if Hall had established a prima facie case, AT&T has rebutted the presumption of retaliation by articulating legitimate, nondiscriminatory reasons for Hall's termination.  And, as discussed previously, Hall has failed to present evidence sufficient to create a genuine issue of material fact regarding whether AT&T's reasons for its actions were a mere pretext for retaliation.

The Eleventh Circuit has "emphasize[d] that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint."  Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1270 (11th Cir. 2010).  Here, as in Alvarez, the record establishes that AT&T "had legitimate non-discriminatory reasons to fire [Hall] before she complained, and it remained free to act on those reasons afterward."  Id.  Additionally,

although Hall argues that AT&T "has provided absolutely no explanation as to why [the Code of Conduct violations] surfaced within sixty days of Ms. Hall's gender discrimination complaint," (Pl.'s Resp., Doc. 25, at 11), AT&T has indeed presented undisputed evidence that the violations were brought to its attention by the employee covering the accounts. This belies any inference that the Code of Conduct violations were merely a pretext for a retaliatory animus on the part of AT&T. AT&T's Motion for Summary Judgment on Count II must be granted.

### 3. Retaliation Under the FMLA (Count III)

Under the FMLA, an eligible employee is entitled to twelve work-weeks of unpaid leave annually "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). In her third claim, Hall asserts that she was terminated in retaliation for having taken FMLA leave.

"[T]o succeed on a retaliation claim [under the FMLA], an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001). "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, [courts] apply the same burden-shifting framework established by the Supreme Court in [McDonnell Douglas] for evaluating Title VII discrimination claims." Id. Hall has not presented any direct evidence of retaliatory intent, and thus the Court evaluates her FMLA retaliation claim under the McDonnell Douglas scheme discussed earlier.

To make a prima facie showing of retaliation, a plaintiff must establish: (1) that she

engaged in activity protected by the FMLA; (2) that she was subjected to an adverse employment action; and (3) a causal connection between the activity and the adverse action. Id. As it did on Hall's Title VII retaliation claim, AT&T asserts that Hall has failed to establish a prima facie case because there is no causal connection between her FMLA leave and her termination.

For the purposes of a prima facie case, temporal proximity between the plaintiff's FMLA leave and the adverse action can be sufficient to create a genuine issue of material fact of causal connection. See Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1268 (11th Cir. 2008). Hall again attempts to establish a causal connection via temporal proximity, noting that she was terminated on the very day of her return from FMLA leave. However, as was the case with Hall's Title VII retaliation claim, any causal connection that could be inferred from temporal proximity is "undermined by the undisputed fact that [AT&T's] steps toward Plaintiff's termination were already underway before [s]he filed for FMLA leave." Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1305 (M.D. Fla. 2002). Because AT&T informed Hall that her sales performance was unacceptable multiple times prior to her FMLA leave—issuing her a Counseling Notice, a Written Warning, and a Final Written Warning before she requested leave—Hall has not established a prima facie case of retaliation under the FMLA. The "wheels of termination were put in motion before [Hall's] request for leave," and no causal connection between her taking of FMLA leave and her termination can be inferred. Tuberville v. Pers. Fin. Corp., No. 3:95CV150-B-A, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996). Summary judgment is thus appropriate based on Hall's failure to establish a prima facie case.

Even if Hall could establish a prima facie case, AT&T has articulated legitimate, nondiscriminatory reasons for terminating Hall, and Hall has failed to create an issue of fact as to whether AT&T's proffered non-discriminatory reasons were merely a pretext for discrimination.  Again, Hall's allegations of pretext are "undermined by the undisputed fact that [AT&T's] steps toward termination were already underway before [Hall] requested leave."  See Beno v. United Tel. Co. of Fla., 969 F. Supp. 723, 726 (M.D. Fla. 1997).  AT&T initiated the disciplinary process five months before Hall requested FMLA leave, and Hall was issued a Final Written Warning just a week before she requested leave.  Hall has not presented any evidence supporting an inference that AT&T was motivated by retaliatory animus or that AT&T intentionally "discriminated against [her] because [s]he engaged in activity protected by the Act."  Strickland, 239 F.3d at 1206.  Even viewing the evidence in the light most favorable to Hall, it is clear that she was on notice prior to taking FMLA leave that her performance was unsatisfactory and had been warned of the possibility of her termination.  There is no evidence that Hall's FMLA leave in any way affected AT&T's decision to terminate her employment.

Hall contends that she should have been afforded an extra seven days after returning from FMLA leave in order to meet her required sales quota and stave off what she characterizes as a December 31, 2007 "deadline" issued by AT&T in the Final Written Warning.  She argues that not allowing her this time upon returning from FMLA leave is an inconsistent application of AT&T's normal practice of "freezing" warnings until an employee returns from leave and thus evidences pretext.  However, Hall's assertion does not rebut the evidence "demonstrat[ing] [that AT&T] would have discharged [Hall] even had she not been

on FMLA leave." O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000).  Hall was warned that her poor sales performance qualified for termination under the next step of AT&T's Discipline Policy, and she knew before mid-December that her job was in jeopardy.  Her December sales numbers—which had become finalized and available to AT&T by the time she returned from FMLA leave—were by her own admission poor, and she may not "insulate [her]self from a pending dismissal by opportunistically invoking the FMLA" when she had been thus warned.  Gipson v. Vought Aircraft Indus., Inc., 387 F. App'x 548, 557 (6th Cir. 2010).

Hall also argues that the fact that the Code of Conduct violations were found during her FMLA leave is evidence of pretext.  However, the fact than an employer uncovers issues regarding an employee while the employee is out on FMLA leave does not necessarily mean that the employee was fired in retaliation for taking that leave.  Cf. Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1242 (11th Cir. 2010).  AT&T has provided a legitimate explanation as to how the violations were uncovered, and Hall has not undermined or rebutted that evidence.

Employers are not "precluded from terminating an employee who has requested or taken FMLA leave, so long as the employee's exercise of FMLA rights is not a factor in the employer's decision to take action against the employee."  Svienty v. Whirlpool Corp., 408 F. Supp. 2d 466, 472 (W.D. Mich. 2005) (citing Pharakhone v. Nissan N. Am., Inc., 324 F.3d 405, 408 (6th Cir. 2003)).  Hall has failed to present a basis for concluding that AT&T was in any way motivated to terminate her because she took FMLA leave.  She has not successfully impeached AT&T's explanation that it terminated her because of her poor

performance—regarding which Hall had been warned months prior to taking leave—and for Code of Conduct violations that were innocently discovered while she was on FMLA leave. Hall has thus failed to create a factual issue as to whether AT&T's articulated reasons actions are a pretext for retaliation under the FMLA.  Summary judgment on Count III must be granted.

III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion for Summary Judgment (Doc 24) filed by Defendant AT&T Mobility Services, LLC is **GRANTED** as to all of Plaintiff's claims.

2. The Clerk is directed to enter judgment in favor of Defendant in accordance with this Order. Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 5th day of August, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record